## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 19-CR-10459-RWZ |
| 23. ANGEL CALDERON, a/k/a "King Bam" | |
| Defendant | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR RELEASE[1]

The government hereby files this memorandum in support of its motion to detain the Defendant, Angel Calderon ("Calderon" or the "Defendant"). Put plainly, the defendant presents a tremendous danger to the community, victims and witnesses, and a pronounced risk of flight. As the evidence submitted in support of detention demonstrates, no conditions of release can assure the safety of the community or particular witnesses in this case, or prevent him from committing additional crimes, or assure his appearance.

The Government appreciates the gravity of the COVID-19 pandemic and acknowledges that it presents a serious national and state public health emergency. However, even in the midst of this pandemic, the factors set forth in 18 U.S.C. § 3142 still guide the Court in determining, on a case-by-case basis, whether pretrial release is appropriate, and as the evidence adduced at the Defendant's detention hearing amply shows, he poses a danger to the community and no conditions or combination of conditions can adequately address these risks. The Defendant's Motion should be denied.

---

[1] The government submitted nineteen exhibits in support of detention. References to exhibits submitted in support of this response are by exhibit number and page or paragraph, where appropriate, e.g., Exhibit _, p. _. The government assumes the Court has access to the defendant's criminal history through the pretrial services report.

## BACKGROUND

## I.   GROUNDS FOR DETENTION

The Defendant is charged in Count One of the Indictment, alleging Conspiracy to

Conduct Enterprise Affairs Through a Pattern of Racketeering Activity, in violation of 18 U.S.C.

§ 1962(d). See D. 1. The government seeks detention of the Defendant on the following grounds:

- 18 U.S.C. § 3142(f)(1)(E), because the Defendant is charged with a felony that involves the possession or use of a firearm;

- 18 U.S.C. § 3142(f)(2)(A), because there is a serious risk the Defendant will not return to Court if released; and

- 18 U.S.C. § 3142(f)(2)(B), because the Defendant presents a serious risk of obstruction of justice.

## II.   DETENTION EVIDENCE

The government submitted seventeen documentary Exhibits in support of detention,

along with a DVD (Exhibit 18), containing various audio and video recordings.[2]

The government summarizes the substance of the submitted exhibits here:

- The Latin Kings criminal enterprise, and the Defendant's membership in the enterprise and leadership role in the Latin Kings Morton Street Bricks Chapter. *See* Exhibit 1, ¶ 132; Exhibit 5, p. 2 (Defendant holding position as Inca of Morton Street Bricks as of March 2019).

---

[2] Exhibit 18 contains the following audio and video files, which the government references in this memorandum: 2019-2-23 - 10.57 to 10.59 - Calderon, M. Rivera Discussion re Guns.mp3; 2019-2-23 - 11.02 to 11.14 Calderon, M.Rivera call Jorge Rodriguez.mp3; 2019-2-23 - 11.20 - Calderon, M.Rivera Drug Talk.mp3; 2019-2-23 - 11.38 to 11.42 - M.Rivera Talk re Dogfood.mp3; 2019-2-23 - 12.53 - Talk re Taking Money for Guns.mp3; 2019-2-23 - CALDERON, A. VELAZQUEZ - Hot Shot.wav; 2019-2-23 - CALDERON, M.RIVERA - 'Im Gonna Kill that Nigga'.mp4; 2019-3-17 - 1st Valdez Violation.mp4; 2019-3-17 - 2nd Valdez and Pena Violations.mp4; 2019-06-12T15.35.27-04.00_000159REDACTED.mp4; 2019-7-30 MERLIN, CLUMSY, CW MEETING - 'Lay Them Down'.mp4; 2019-7-30 MERLIN, CLUMSY, CW MEETING -'How You Gonna Send Somebody on Bracelet to do a Murder'.mp4; and 2019-09-26 - MP5 Purchase.mp4.

- The Detention Affidavit provides and overview of Calderon's involvement in the conspiracy to murder Angel Roldan. See Exhibit 1, ¶¶ 161-172.

- The Defendant's participation in the beating of Victim 1.  See Exhibit 1, ¶¶ 173-177l; Exhibit 15. Victim 1 was targeted due to his perceived cooperation with law enforcement.  The Defendant was identified as being part of the group that was present in New Bedford and employed to assault Victim 1 because of his cooperation.

- A February 23, 2019 recording of the Defendant, codefendant Marlon Rivera, and a CW, where the conspirators discuss codefendant Angel Roldan. See Exhibit 2; Exhibit 18 ("2019-2-23 - CALDERON, M.RIVERA - 'Im Gonna Kill that Nigga'"). During the recording, the Defendant discusses Roldan perceived violations of Latin King policy.  The Defendant does not mince words about his intention to kill Roldan, stating "I don't give a fuck I'm a killa. If I see that nigga imma kill this nigga in front of your kids and all that, nephews and nieces they're gonna witness a murder. [UI] Cousins, everbody, it could be your grandmother out there, she gonna witness your death."  Exhibit 18 ("2019-2-23 - CALDERON, M.RIVERA - 'Im Gonna Kill that Nigga'"); see Exhibit 2, p. 5; Exhibit 3 (earlier portion of conversation where the Defendant states "I would've shot Big A if he did that to me."

- A February 23, 2019 recording of the Defendant, codefendant Marlon Rivera, codefendant Jorge Rodriguez and a CW discussing the firearms that Calderon had provided the Latin Kings.  See Exhibit 18 ("2019-2-23 - 10.57 to 10.59 - Calderon, M. Rivera Discussion re Guns").  During this recording the Defendant describes giving a firearm to codefendants Wilson Peguero and Alexis Peguero.  See Exhibit 2, p. 2 ("CALDERON I had a clip and a gun They had my gun for a little bit but I told them to give it to double O").

- A series of February 23, 2019 recordings of the Defendant, codefendant Marlon Rivera, and a CW, where the Defendant provides Marlon Rivera with cocaine base and they discuss narcotics distribution techniques and methods of adulterating narcotics for additional profit.  See Exhibit 18; Exhibit 2, p. 3-4.  The Defendant also Marlon Rivera's "plug" or source of supply.  During the recording, the Defendant gives Marlon Rivera 1.5 grams of cocaine base.  See Exhibit 3, p. 2.  The Defendant also tells the CW earlier in the recording, "don't worry about a plug I got you." Exhibit 3, p. 1.

- A February 23, 2019 recording of the Defendant, codefendant Alexis Velasquez, and a CW, where the conspirators discuss their efforts to murder a rival gang member by means of poisoned narcotics.  See Exhibit 18 ("2019-2-23 - CALDERON, A. VELAZQUEZ - Hot Shot"), Exhibit 3, p. 2, Exhibit 4 (transcript).  During this recording, the Defendant and Velasquez discuss their attempts to kill a rival gang member of the Dominicans Don't Play gang because he killed the Defendant's cousin.  As the Defendant puts it, "We're gonna get his ass, nigga killed my cousin, we're gonna get his ass. Fact."  Exhibit 4.

3

- Two March 17, 2019 recordings of the Defendant, and numerous other members of the Latin Kings, where the Defendant served as a ranking member, and ordered three beatings of members for violations of Latin Kings rules.  See Exhibit 5 (report of 3/17/19 meeting); Exhibit 18 ("2019-3-17 - 1st Valdez Violation", "2019-3-17 - 2nd Valdez and Pena Violations").  During these recordings, the Defendant can be seen ordering other members to beat two members who are in violation of Latin Kings rules. The Defendant issues orders to the members, selecting who will deliver the punishment and ensuring compliance with tenets of how the discipline should be meted out, i.e., counting and the victim holding up his crown handsign over the head during the beating. Additionally, codefendant Francisco Lopez, a member of the state leadership structure, is present during this meeting as well.

- A June 12, 2019 recording of the Defendant and a subordinate member of his Morton Street Bricks Chapter receiving a black firearm from codefendant Jorge Rodriguez. See Exhibit 8 (report); Exhibit 18 ("2019-06-12T15.35.27-04.00_000159REDACTED").

- A June 14, 2019 Boston Police incident report where the Defendant put a black firearm in the face of a victim and threatened to kill her.  See Exhibit 6.  During the incident, the Defendant a male that she "ran up to her, pulled out a black firearm, chambered a round, and then put it up to her face" and "then said, 'you've been snitching. I'll kill you and your brothers.'"  Exhibit 6.  The Defendant was known to the victim and an eyewitness for many years, and both positively identified him, in part through his distinctive facial tattoos.  The Defendant was arrested and charged with this case on June 14, 2019, and released after posting a cash bail.  See Dorchester District Court, Docket No. 1907CR01944.  This case remains pending, and according to the state prosecutor, is ready for trial, though the Defendant has since been taken into federal custody.

- A July 30, 2019, recording of codefendant Cecchtelli, codefendant Marrero, and a CW discussing the Defendant's role in a planned murder of codefendant Angel Roldan.  See Exhibit 1, ¶¶ 161-172; Exhibit 9 (report of 7/30/19 recording); Exhibit 10 (transcript of 7/30/19 recording); Exhibit 18 (7/30/2019 recordings).  During this recording, codefendant Cecchetelli, codefendant Marrero, and a CW discuss the recent order to kill Angel Roldan that was issued by codefendant Juan Liberato.  As the regional leader, codefendant Cecchetelli expresses his displeasure that the order to kill Roldan was given to "Bam" (Calderon) who was then on pretrial release and on gps monitoring for the June 14, 2019 incident.  This conspiracy was interrupted through FBI alerting Roldan to the then-pending threat, and Roldan alerted Latin King leadership who stopped the order.  The following exchange is captured on the recording:

> CECCHETELLI: That's what I don't understand. You say he sent it out the same day. Prodigy says I didn't tell him to do it now. I just told G, be

ready, if he don't pay in 2 months, then G go at his head. But G says no, he wanted it done now.

CW-9: And G.. [UI]

MARRERO: Where G fucked up, like I told you. He sending niggas who already got a problem with him.

CECCHETELLI: BAM is on a bracelet… BAM is on a bracelet, how you gonna send someone on a bracelet to do a murder….

- A September 26, 2019 recording of the Defendant, codefendant Alexis Velasquez, codefendant Oscar Pena, selling a semiautomatic .22 caliber MP5 rifle with a purported silence to codefendant Jorge Rodriguez, and codefendant Roberto Vargas. See Exhibit 1, ¶ 280; Exhibit 11; Exhibit 18 ("2019-09-26 - MP5 Purchase").

- Materials and photographs from the December 5, 2019, search warrant executed at the residence of a Latin Kings member, where the semiautomatic .22 caliber MP5 rifle was recovered.  See Exhibit 16 (report of Jorge Rodriguez's firearms being stored at 103 Maple Street); Exhibit 12 (pictures of recovered MP5); Exhibit 13 (search log).

## **LEGAL STANDARD**

A defendant must be detained pending trial if, after a hearing, the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).[3]  The government bears the burden of demonstrating that the defendant poses a danger to the community by clear and convincing evidence, or that the defendant poses a flight risk by a preponderance of the evidence.  See United States v. Rose, 2012 WL 2500497, *1 (D. Mass. 2012) (Gorton, J.).

---

[3] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*."  S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); see also United States v. Patriarca, 948 F.2d 789, 792–793 (1st Cir. 1991).

In determining whether any conditions of release will reasonably assure the defendant's appearance and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community.

Additionally, the Court may "permit the temporary release" of the defendant to the custody of "a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).  The defendant carries the burden of showing that his release is necessary to the preparation of his defense or for another compelling reason.  See United States v. Dupree, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011) ("A defendant has the burden of showing that temporary release is 'necessary for preparation of the person's defense' under Section 3142(i).") (citations omitted).

## ARGUMENT

## I.   THE DEFENDANT IS AN EXTREMELY SERIOUS DANGER TO THE COMMUNITY AND A RISK OF FLIGHT

Each and every factor supports the Defendant's detention, and demonstrates that no conditions of release can assure the safety of the community, witnesses and victims, prevent obstruction of justice, or assure his appearance.

### A.   NATURE AND CIRCUMSTANCES OF THE CHARGED OFFENSES

As the affidavit and evidence submitted makes clear, the Defendant's involvement in the Latin Kings includes a leadership role, directing the affairs of a local chapter of the enterprise and its members.  In particular, the evidence submitted demonstrates that the Defendant

conspired to commit multiple murders, including the murder of rival gang (DDP) member, and Angel Roldan.  Additionally, the Defendant has personally intimidated witnesses and employed a firearm to do so.  Beyond the use of violence against rivals and witnesses, the Defendant is willing to employ violence internally in the gang, as well.  As two recordings on Exhibit 18 from March 17, 2019, make clear, the Defendant directs and orders the violence, overruling the protestations of other members and deciding which member will inflict the punishments.

Consequently, the Defendant faces a considerable sentence if convicted. At a minimum, the Defendant's offense level is 33, based upon at least one conspiracy to murder.  See USSG 2A1.5(a).  Furthermore, adjustments based upon leadership and obstruction of justice may apply that raise the offense level by six.  As such, with the Defendant's criminal history being conservatively level IV, the guideline sentence range is anticipated to potentially be in the area of 188 to 235 months (assuming offense level 33), and likely greater than that, based on the evidence presented at this hearing alone.

### B.       WEIGHT OF THE EVIDENCE

The weight of the evidence also overwhelmingly supports detention.  See Exs. 1-18. The numerous recordings alone prove his membership in the enterprise, leadership of subordinates, and participation in the racketeering conspiracy.  Given the Defendant's blunt specification of his intention and willingness to murder Roldan (in front of Roldan's family no less), and the acknowledgment by multiple levels of the enterprise that the Defendant was in fact tasked to murder Roldan, there is little left unsaid on the recordings.  Additionally, the Defendant's second conspiracy to murder the rival gang member by means of poisoned heroin (hotshot) is also quite explicit on the recording as to the existence of the conspiracy to murder and the manner/means that they intend to accomplish it.

### C.       HISTORY AND CHARACTERISTICS OF THE DEFENDANT

The Defendant has an extensive criminal history, listing numerous arrests and multiple

prior criminal convictions. The Defendant's criminal history lists the following prior convictions:

- Suffolk Superior Court, Possession of a Firearm, Subsequent Offense, Docket No. 1484CR10421, sentenced to three to four years.  Defendant violated probation.

- West Roxbury District Court, Possession of a Firearm, Docket No. 1106CR002051, sentenced to eighteen months.

- Roxbury District Court, Assault and Battery, Docket No. 1102CR001085, sentenced to six months.

- West Roxbury District Court, Assault and Battery, Docket No. 0906CR002794, continued without a finding, and dismissed after violation of probation.

The government also provided the Court with historical police reports from Boston Police

concerning the Defendant.  A report from October 2011, details the Defendant's possession of a

firearm found on his person, and notes his historical involvement in firearm violence.  See

Exhibit 17, p. 1-2.  This incident report relates to prior conviction in Docket No. 1106CR002051.

A report from May 2014, pertains to the Defendant's second firearm conviction in

Docket No. 1484CR10421. As before, a firearm was found on his person after a pat frisk.  See

Exhibit 17, p. 11-12.

A report from November 2017 details an incident where the Defendant was in a vehicle

with codefendant Oscar Pena.  During the course of an inventory search, cocaine and heroin

were located in the vehicle.  See Exhibit 17, p. 15-16.  This case was charged and ultimately

dismissed, though it did occasion a violation of the Defendant's probation.  See Docket

1707CR004156.

### D.       NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE

The Defendant presents a serious danger posed if released. Despite a lengthy state prison sentence, house of correction sentences, commitment to DYS, multiple stints of probation, and being on pretrial release, this Defendant continues to remain a member of the Latin Kings and in fact holds a prominent leadership position within the enterprise.  Indeed, the Latin Kings as an enterprise, and this Defendant in particular, are willing and able to commit brazen acts of witness intimidation against those who cooperate and employ firearms to do so.  The Detention Affidavit specifies ten other instances of witness intimidation undertaken by the Latin Kings (including the termination of Victim 1 in which the Defendant participated).  The June 2019 incident described in Exhibit 8 is not described in the Detention Affidavit (Exhibit 1), and this incident comprises the eleventh such incident of witness intimidation committed by the Latin Kings that is before the Court.

These facts alone bespeak the danger to the community and witnesses that the Defendant presents if released, and prove that conditions of release would do nothing to impede the Defendant from endangering the public through the commission of crimes and targeting witnesses and victims.  As the detention evidence makes clear, this Defendant and members of this enterprise will not hesitate to target other witnesses and victims.  Detention is the only means to prevent the Defendant from committing further crimes, ensure the safety of witnesses and victims, and assure the Court that the Defendant will return to answer to the charges.

## II.    THE COVID-19 VIRUS DOES NOT COMPEL THE DEFENDANT'S RELEASE

The Defendant's Motion does not address the statutory factors that guide the detention analysis, and instead argues for release primarily on the basis that COVID-19 is dangerous.  *See* D. 759 ("The severe risk Mr. Calderon faces from the COVID-19 pandemic requires his release on appropriate conditions.").  However, the COVID-19 pandemic—while undoubtedly serious

and necessitating strong precautionary steps, particularly in detention facilities like Wyatt

Detention Facility ("Wyatt")—has not changed the facts and circumstances particular to the

Defendant that demonstrate his risk of obstruction and danger to the community, and risk of

flight and therefore does not warrant his release.

The Defendant's argument for release relies primarily on generalized fears about the

specter of a COVID-19 outbreak at Wyatt.  However, the Defendant's speculative concerns

about the risk to his health in the event of an outbreak do not satisfy the requirement of 18 U.S.C.

§ 3142(g) and they do not constitute a "compelling reason" justifying his release under 18 U.S.C.

§ 3142(i), particularly in light of the extensive precautionary measures that Wyatt has taken to

reduce the risk of transmission.  <u>See</u> Exhibit A (Wyatt COVID-19 status report).  Moreover, the

Defendant does not show that his proposed plan for release would in fact mitigate his risk of

contracting COVID-19, nor does he make any serious effort to show that if he were to be

released he would not pose a continuing danger to the community.  For these reasons, he fails to

carry his burden to show that his temporary release is warranted under Section 3142(i).

## A. *The Speculative Risk of COVID-19 Is Not A Compelling Reason For Release*

The Defendant has not demonstrated that the speculative risk of a COVID-19 outbreak at

Wyatt poses a risk to his health.  Although the courts have recognized that a defendant's medical

condition can be a compelling reason justifying temporary release, they have only done so

"sparingly to permit a defendant's release where, for example, he is suffering from a terminal

illness or serious injuries."  <u>United States v. Hamilton</u>, No. 19-CR-54-01 (NGG), 2020 WL

1323036, at *2 (E.D.N.Y. Mar. 20, 2020).

Indeed, in the rare cases where courts have found a medical condition to be a compelling

reason for release, the defendants were actually suffering from severe medical conditions that

could not be adequately treated at their detention facilities.  <u>See</u>, e.g., <u>*United States v. Scarpa*</u>,

815 F. Supp. 88 (E.D.N.Y. 1993) (releasing defendant who suffered from terminal AIDS that could no longer be managed by correctional authorities, where he was unlikely to survive long enough to stand trial, and "the restrictive terms of his house arrest," in connection with his physical incapacitation, "would effectively incapacitate [him] to the same extent as prison"); United States v. Cordero Caraballo, 185 F. Supp. 2d 143, 145 (D.P.R. 2002) (releasing defendant who sustained significant injuries from bullet wounds, including open wounds that required continued medical treatment that the Bureau of Prisons could not treat; the Marshal Service paid for the services of guards to supervise him; and he was unable to walk, suffered from partial paraplegia, remained in a lying position, had loss of function in his arms, and was thus not "mobile enough to roam in the community.").

Similarly, in other cases where the courts have released defendants based on their medical condition, the courts emphasized that the defendants had significant, life-threatening health problems that could not be treated in their detention facilities, and found that there were conditions of release that could ensure the safety of the community.[4]

Comparatively, the Defendant does not argue that he has contracted COVID-19 or that he has anything that could be described as symptoms—he only raises concerns about the possibility of contracting it.  Nor does the Defendant claim that he would not be able to receive adequate

---

[4] See United States v. Johnston, No. 17-00046 (RMM), 2017 WL 4277140, at *4 (D.D.C. Sept. 22, 2017) (finding that the defendant's "need for prompt cancer testing and treatment, paired with his belief" that his continued detention would delay such treatment "to a degree that imperils his life, rebuts the statutory presumption of detention," and that the court could ensure the safety of the community by imposing stringent "release conditions tailored to the nature of the charges [he] face[d] and his need for medical treatment."); United States v. Adams, No. 6:19-MJ-00087-MK, 2019 WL 3037042, at *2 (D. Or. July 10, 2019) (defendant rebutted presumption by showing "evidence of an extraordinary life-threatening medical condition the BOP cannot treat and further show[ing] the safety of the community may be reasonably assured through conditions of release.").

care at Wyatt if he were to contract the virus.  Moreover, the Defendant does not appear to suffer from any serious medical condition that would make him particularly susceptible to complications from COVID-19.  Cf. Def. Exs. 19, 20. The Defendant has submitted medical records from approximately ten years ago that, at least based on a cursory review, do not describe any chronic underlying medical condition.  The Defendant's motion does not reference any underlying condition either.  This falls far short of the severe injury and urgent need to obtain care outside of a detention facility that has warranted release in other cases.

As several courts have held, the speculative risk of a COVID-19 outbreak is not a compelling reason for release under Section 3142(i)—even in cases where the defendant has an underlying medical condition that increases his or her risk of severe illness from the virus.[5] Thus, the clear trend among several courts that have addressed this issue is to deny temporary release, even when the defendant raises individualized risk factors based on his or her health condition, where there is only a generalized concern about the potential of a COVID-19 outbreak and the detention facility is taking reasonable measures to mitigate the risk. See D. 802, United States v. Cecchetelli, 19-CR-10459, Order of Detention on Jorge Rodriguez (Bowler, M.J.) ("This court finds no special, extraordinary or particularized concerns regarding the medical

---

[5] See United States v. Clark, No. 19-40068-01-HLT, 2020 WL 1446895, at *8 (D. Kan. Mar. 25, 2020) (denying release of defendant whose diabetes put him at increased risk of serious illness from COVID-19 where the risk of an outbreak at his facility was speculative, he did not show that his proposed release plan would reduce his overall risk, and his release would put pretrial services and law enforcement at increased risk); United States v. Lunnie, No. 4:19-CR-00180 KGB, 2020 WL 1644495, at *5 (E.D. Ark. Apr. 2, 2020) (COVID-19 was not a compelling reason warranting release under 18 U.S.C. § 3142(i) where the defendant's arguments about a potential outbreak at his facility were speculative, he failed to show that his "lifelong bouts with bronchitis" increased his risk of severe illness if he were to contract COVID-19, and he did not demonstrate that "his proposed release plan would necessarily alleviate his overall COVID-19 risks," or the risks to the community).

status of the defendant. The motion raises only systematic and not particularized concerns about the facility where the defendant is detained. The defendant does not set forth with adequate specificity any medical conditions that would make him more vulnerable or at risk than other detainees in the institution. ").

Accordingly, in a case like this—where the defendant raises only speculative concerns about the risk of contracting a virus, does not currently suffer from a medical condition that requires treatment outside of the detention facility, and has made no effort to explain why his continued detention would prevent him from obtaining adequate care if he were to become sick—no compelling reason exists to grant temporary release under Section 3142(i).[6]

### B. The Defendant Has Not Shown that Wyatt's Precautionary Measures Are Inadequate To Mitigate the Risks of COVID-19 to Detainees

Nor can the Defendant establish that the speculative risk of COVID-19 is a compelling reason to release him from detention when he is housed at a facility that has taken extensive precautionary measures to mitigate the risk.  The Government agrees that COVID-19 presents a public health emergency.  All facets of national, state, and local government have turned their focus and determination to slowing the spread of the outbreak, protecting the health and safety of the community, and addressing the medical needs of those who have contracted the virus.  That focus and attention includes authorities and staff responsible for federal and state detention facilities, including at Wyatt.

---

[6] See United States v. Rebollo-Andino, 312 F. App'x 346, 348 (1st Cir. 2009) (declining to reverse denial of motion for release based on health conditions under 18 U.S.C. § 3142(i) where the defendant did not identify any specific medical conditions and failed to "explain why his detention would prevent him from obtaining adequate treatment" for any condition that he did have).

Wyatt has adopted extensive measures to prevent the spread of COVID-19 into its facilities, and put into place a protocol for isolation and treatment of those who contract the virus. See Exhibit A. The government will not restate the entire scope of efforts, but they are robust, involving 24 hour onsite medical personnel, testing, frequent cleanings, quarantine procedures, and screening of all those who enter the facility. There are also extensive procedures in place to deal with any positive cases of COVID-19, including contact tracing, isolation, and, if necessary, transportation to a medical facility. Consequently, the Defendant has failed to show that in light of these effective efforts, detention puts him at sufficient risk of contracting COVID-19 or developing serious medical consequences to warrant release. See Hamilton, 2020 WL 1323036, at *2.

### C. The Defendant's Proposed Release Would Not Mitigate the Risks of COVID-19 or His Danger to the Community

The Defendant also does not show that his proposed plan for release would actually mitigate his risk of contracting COVID-19. Although he proposes release, he offers no evidence that his proposed plan would actually mitigate the risk of infection compared to the risk he faces while detained at Wyatt. Indeed, the Defendant offers no details about the comparative risk he faces at home: he does not address who visits the proposed residence and whether they will be screened for COVID-19 prior to his interactions with them; he does not address his access to medical care if he were to become sick; and he fails to identify any specific COVID-19 precautions that are begin taken at his residence, such as requiring all members of the household to observe recommended social distancing, wear masks, and follow hygiene practices to reduce the risk of exposure to the virus.

Accordingly, there is no concrete evidence that the Defendant's risk of contracting the virus would be any lower while released where he has not demonstrated that there are any

protections against exposure to the virus than if he were to remain detained at a facility which

has implemented extensive precautionary measures to reduce the risk of infection to all inmates.[7]

Furthermore, the Defendant makes no serious effort to show that, if he were released, he

would not continue to pose a serious danger to the community.  The Defendant proposes release,

but he does not propose—and there is no practical way to impose—a limitation on his access to

landline phones, smartphones, and other digital communication devices.  Thus, there is no way to

enforce the proposed condition restricting him from having contact with other members of the

Latin Kings and continuing his racketeering activity through such communications.

Moreover, as other courts have observed when denying release to dangerous defendants

in the same context, "location monitoring is not a limitless resource, nor is its installation and

monitoring by United States Pretrial Services officers without risk to those personnel (who must

be trained and certified to install location monitoring) given the current recommendations

regarding implementation of social distancing."  United States v. Martin, No. CR PWG-19-140-

13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020).  Additionally, pretrial services is no longer

able to provide location monitoring during the pandemic, and that condition is no longer capable

of being ordered.  As such, releasing him would impose a further burden on the already strained

resources of pretrial services as well as federal, state, and local law enforcement.[8]

---

[7] See Lunnie, 2020 WL 1644495, at *5 (finding that the proposed release to home confinement was not "necessary" for a compelling reason under Section 3142(i) where it was not "tailored to mitigate . . . the defendant's overall COVID-19 risks," including because the defendant did not show that adequate COVID-19 precautions would be taken at his home and there was thus "nothing more than speculation that home detention would be less risky than living in close quarters with others" in jail, "which at least has screening practices and other reasonable COVID-19 precautions in place."); Clark, 2020 WL 1446895, at *6 (same).

[8] Cities hard-hit by the pandemic are reporting large numbers of their officers quarantined due to COVID-19.  See ABC News, Despite COVID-19 losses, quarantines, Detroit police

Probationary and pretrial conditions ordering him to not commit crimes have proven fruitless in stopping him from associating with and leading the gang, purchasing and handling firearms, participating in beatings, or distributing controlled substances.  Based on all of the above, the Defendant presents an overwhelming and unmitigated danger to the community if released, and must be detained.

## CONCLUSION

The Defendant presents a significant danger to the community, a serious risk of flight, and a serious risk of obstructing justice.  No conditions can assure the safety of the community, prevent the obstruction of justice, or assure the Defendant's return to Court.  As such, the Defendant must be detained.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Philip A. Mallard*
        Philip A. Mallard
        Assistant U.S. Attorney
        United States Attorney's Office
        1 Courthouse Way, Suite 9200
        Boston MA 02210
         617-748-3674

---

soldier on (April 4, 2020), *available at* https://abcnews.go.com/US/courageous-resilient-detroit-police-solider-covid-19-outbreak/story?id=69971709 (noting that over 500 Detroit Police Department officers are quarantined and 114 civilians and officers tested positive for the virus); Time, Police Departments, Sheriffs' Offices Across the U.S. Grapple With COVID-19's Impact on Public Safety—and Their Own (April 2, 2020), *available at* https://time.com/5812833/coronavirus-police-departments/ (noting that more than 1,000 New York City Police Department personnel have tested positive for COVID-19, and over 17% of that workforce is currently out sick).

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Philip A. Mallard
Philip A. Mallard
Assistant U.S. Attorney

Date: April 29, 2020