```
             UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
```

UNITED STATES OF AMERICA

    v.                                                                       CRIMINAL NO.
                                                                        19-10459-RWZ

MICHAEL CECCHETELLI, et al.,
     Defendants.

**MEMORANDUM AND ORDER RE:**
**DEFENDANTS' MOTION TO COMPEL THE GOVERNMENT TO MAKE A**
**PARTICULARIZED SHOWING OF GOOD CAUSE FOR PROTECTIVE**
**ORDER IN COMPLIANCE WITH THE COURT'S ORDER**
**(DOCKET ENTRY # 948)**

**August 14, 2020**

**BOWLER, U.S.M.J.**

    Defendants Angel Ortiz, Matthew Palacios, Steven Familia Valdez ("Valdez"), Kevin Guadalupe, Jose Vasquez, and Gregory Peguero-Colon seek to compel the government to make a particularized showing of good cause for a protective order restricting the dissemination of discovery with respect to each defendant or, in the alternative, with respect to "a segmented group of defendants." (Docket Entry # 948, p. 2). A number of other defendants ("defendants")[1] joined the motion to compel and, at times, raised difficulties accessing discovery specific to

---

[1] "Defendants" refers to the defendants who joined the motion as well as to defendants Angel Ortiz, Matthew Palacios, Valdez, Kevin Guadalupe, Jose Vasquez, and Gregory Peguero-Colon.

their circumstances.  Among other concerns, defendants submit that the burdens to access and review discovery with counsel are substantial.  Defendants' concerns also differ depending upon the facilities of the institution at issue as well as defendants' status as released or incarcerated.  In opposing the motion to compel, the United States of America ("the government") seeks to avoid disclosing the identities of cooperating witnesses and to guard against threats and violence instituted against government and non-law enforcement witnesses as well as victims.  (Docket Entry ## 1009, 1114) (Docket Entry # 703, p. 2, ¶ f).

## BACKGROUND

Defendants in this racketeering and drug prosecution are former and current members or associates of the Almighty Latin King and Queen Nation ("Latin Kings") charged in a 62-person, nine-count Indictment with a conspiracy to conduct enterprise affairs through a pattern of racketeering activity; conspiracies to distribute and to possess with intent to distribute cocaine and/or cocaine base and fentanyl; distribution and possession with intent to distribute cocaine; and firearms offenses. (Docket Entry # 1).  On February 12, 2020, this court denied the government's previous motion for a protective order (Docket Entry # 359) without prejudice (Docket Entry # 508).  The Order identified two concerns:

> First[,] . . . [t]he government's attempt to group all defendants into one category with heightened and significant

>restrictions of discovery access suitable for only certain defendants . . . is overbroad, does not account for different levels of violence and retaliation by different defendants or segmented groups of defendants, and generally fails to make the necessary showing of good cause.
>
>Second, the proposed protective order makes no distinction between different categories of discovery material thus grouping the mundane and routinely-produced material with highly confidential material, such as information that would reveal the identity of a cooperating witness.

(Docket Entry # 508). The Order concluded with an instruction to the parties to "meet and confer to address these and other concerns and make a good faith, concerted effort to agree to the terms of a mutually acceptable protective order." (Docket Entry # 508).

In accordance with this directive, the parties agreed to the terms of a temporary protective order ("TPO") (Docket Entry # 630-1) in late March 2020, which this court entered on April 7, 2020 (Docket Entry # 703). The TPO affords protection for discovery "materials that may identify a cooperating witness, a non-law enforcement witness, or a crime victim in the case." (Docket Entry # 703, p. 2, ¶ f). "[D]iscovery materials" that fall outside this definition of "Protected discovery materials" (henceforth "Protected Material") are not subject to the TPO.[2] (Docket Entry # 703, p. 1, ¶ e). The relief the government

---

[2] Taking into account the government's designations, detailed infra, the protected and unprotected categories in the PTO nevertheless sufficiently address and ameliorate the second concern.

3

presently seeks is to keep the TPO in place.  (Docket Entry # 1009, pp. 13-14) (Docket Entry # 1114, p. 61).

As of the date of the June 8, 2020 status report, the government had produced more than 100,000 "recordings, files and documents," including "wiretaps, consensual audio video recordings, reports, [and] telephone records" (Docket Entry # 977, p. 1) under the terms of the TPO.  However, it designated almost all of the material as protected.  (Docket Entry # 1059, p. 2) (Docket Entry # 1059-1).  In a June 26, 2020 filing, the Coordinating Discovery Attorney estimated that the government designated "approximately 92%" of discovery material produced as Protected Material subject to the TPO.  (Docket Entry # 1059, p. 2) (Docket Entry # 1059-1).  On July 21, 2020, the government provided an update on the discovery produced to date (Docket Entry # 1132), and this court assumes it continued to designate the bulk of the recently-produced material as protected.

The restrictions of the TPO bar incarcerated defendants from printing, copying, maintaining, or disseminating all Protected Material.  (Docket Entry # 703, p. 2, ¶ j).  The TPO only allows members of a "Defense Team" to access and copy discovery material, and it prevents any Defense Team member from providing Protected Material to any defendant, including released defendants, and any unindicted co-conspirator or agent.  (Docket Entry # 703, pp. 1-2, ¶¶ d, g, i).  Released defendants may

review Protected Material only in the presence of a member of the Defense Team.  Incarcerated defendants, however, may individually review Protected Material supplied to the institution on an institution or government-provided computer "outside the presence of any Defense Team member."  (Docket Entry # 703, p. 2, ¶ j).

The TPO's restrictions nevertheless are not ironclad because the TPO allows a defendant to seek relief from the court on the basis that distributing Protected Material to an "unindicted co-conspirator is necessary" to prepare a defense or "in the interests of justice."  (Docket Entry # 703, p. 2, ¶ i).  The TPO also enables a defendant to ask the government to re-classify a protected document as unprotected.  (Docket Entry # 703, p. 3, ¶ o).

## DISCUSSION

Federal Rule of Criminal Procedure 16(d) ("Rule 16(d)") governs protective orders and requires the existence of "good cause" to deny or restrict discovery. Fed. R. Crim. P. 16(d); see United States v. Bulger, 283 F.R.D. 46, 52 (D. Mass. 2012) ("good cause" provides basis to enter protective order under Rule 16(d) and "requires a particularized, specific showing").  Good cause typically "requires 'a particularized, specific showing.'"  United States v. Williams, Crim. No. 15-10145-RGS, 2015 WL 5923551, at *3 (D. Mass. Oct. 9, 2015) (quoting Bulger, 283 F.R.D. at 52); see United States v. Wecht, 484 F.3d 194, 211

(3rd Cir. 2007) ("'[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing'") (internal citation omitted); <u>United States v. Carriles</u>, 654 F. Supp. 2d 557, 565 (W.D. Tex. 2009) ("motion for a protective order ordinarily 'contemplates a particular and specific demonstration of fact'") (internal citation omitted); <u>see also</u> <u>Anderson v. Cryovac, Inc.</u>, 805 F.2d 1, 7 (1st Cir. 1986).  An overly-restrictive protective order may also negatively impact the ability of defendants to defend against the charges at trial.  <u>See</u> <u>United States v. Smith</u>, 985 F. Supp. 2d 506, 544 (S.D.N.Y. 2013) (recognizing need to consider "how burdensome a protective order would be on [defendants], being particularly sensitive to the extent to which a protective order would hinder their efforts to defend themselves at trial"). Conversely, the advisory committee notes to Rule 16(d) endorse the "obvious" appropriateness of a protective order "where there is reason to believe that a witness would be subject to physical or economic harm if his identity is revealed."  Fed. R. Crim. P. 16, Advisory Committee Notes to the 1974 Amendment.  Similarly, "the safety of witnesses and others, a particular danger . . . or witness intimidation" are also among the considerations to take into account.  Fed. R. Crim. P. 16, Advisory Committee Notes to the 1966 Amendment.

As noted, defendants submit that the TPO "imposes a

substantial burden" on them.  (Docket Entry # 948, p. 2).  Released defendants encounter the burden of "long-distance travel to their attorneys' offices in violation of social distancing practices" imposed due to the pandemic, according to defendants.  (Docket Entry # 1059, p. 3).  Defendants represent that incarcerated defendants are required to share computers and review discovery material together thus foregoing privacy and social distancing practices.  (Docket Entry # 1059, p. 3).

In contrast to these and other burdens placed on defendants, the government has a real and substantial concern of protecting cooperating witnesses against acts of retaliation and even death.  (Docket Entry # 1009-2, ¶ 3).  For example, members of the Latin Kings, including those released from custody, are required to seek out law enforcement paperwork and provide other members with any document that tends to identify members who are cooperating with law enforcement.  (Docket Entry ## 1009-1, 1009-2).  As pointed out by the government and set out in an affidavit, in December 2018, defendant Angel Rodriguez ("Rodriguez"), while incarcerated, sought to confirm the identity of another individual as a cooperator before going forward with a plan to physically harm the individual.  (Docket Entry # 1114, pp. 3-6) (Docket Entry # 12-1, ¶¶ 194, 197-201 and n.11).  The cooperating witness forwarded the paperwork and at the same time ensured that the targeted individual was "moved to a protected unit within the

[Massachusetts Department of Correction]" ("DOC").  (Docket Entry # 12-1, p. 65, ¶ 200); see also (Docket Entry # 12-1, p. 24, ¶ 71) (attesting to "[Rodriguez's] participation in the acts of violence while in DOC custody"); (Docket Entry # 12-1, p. 61, ¶ 192) (describing organizational structure of communications between DOC-incarcerated Latin Kings members and outside leadership).  Separately, the District Judge determined that another Latin Kings member, defendant Gregory Peguero-Colon, demonstrates a "dedication to uncovering the identities of confidential witnesses and marking those witnesses for assaults." (Docket Entry # 1084, p. 4).  The government also has a real and viable concern of protecting victims and non-law enforcement witnesses from acts of violence and threats.  It articulates and elucidates those concerns relative to the dangers posed by each defendant, with the exception of defendants Dairon Rivera ("Rivera") and Sophia Velazquez ("Velazquez"), in a recent and comprehensive 61-page filing, which provides a number of case-specific instances with ample support in the record.  (Docket Entry # 1114).

   In the case at bar, the risk of transmission of sensitive discovery material to other Latin King members is greater in the event of a disclosure of sensitive material to non-incarcerated member defendants than to incarcerated member defendants in light of the former's increased freedom and ability to transmit the

8

material.  (Docket Entry # 1009-2).  The government's reasoning as to Valdez (Docket Entry # 1114, pp. 6-7), however, falters given his excommunication from the Latin Kings near the end of the summer of 2019.[3]  (Docket Entry # 510, pp. 11-12). Accordingly, the burdens of traveling to attorneys' offices or to meet a Defense Team member as well as reviewing the material only in the presence of a Defense Team member are warranted. Conversely, even though incarcerated defendants have less opportunity to transmit or use material disclosed during discovery to harm government or non-law enforcement witnesses, Palacios' above-noted transmission and coordination with an incarcerated member to target an incarcerated, suspected cooperator provides one of multiple case-specific instances in the record that support the need for the PTO's restrictions on incarcerated defendants.  The TPO's different treatment of incarcerated and released defendants coupled with the levels of violence identified by the government (Docket Entry # 1114) supported in the record satisfies the first concern identified in the February 2020 Order.

     On balance, the government's concern of protecting government and non-law enforcement witnesses as well as victims against retaliation, acts of violence, witness intimidation, and

---

[3] Valdez is currently released and resides in his father's house in Rhode Island.  (Docket Entry # 1177-1, pp. 3-4, 17, 19-20).

other harm is undeniably valid, and sufficiently established in the record to provide good cause for the restrictions imposed by the PTO.  See United States v. Williams, 2015 WL 5923551, at *4 (citing Bulger, 283 F.R.D. at 55-56); see also United States v. Mitchell, No. 1:15-cr-00040-JAW-3, 2016 WL 7076991, at *2 (D. Me. Dec. 5, 2016); see generally United States v. Celis, 608 F.3d 818, 832 (D.C. Cir. 2010) (rejecting defendants' argument that protective order and government's use of pseudonyms for its witnesses was unnecessary because government failed to show defendants "personally threatened any government witness" given their association with drug trafficking organization, which threatened to kill two cooperating witnesses).  Having reviewed all of the relevant records, this court concludes that "good cause" exists to support the application of the existing TPO (Docket Entry # 703) to defendants, with the exception of Rivera and Velazquez in light of the government's supplemental response as to these two defendants (Docket Entry # 1149) and Valdez in light of his excommunication from the Latin Kings.  The government and counsel for these defendants shall confer and attempt to arrive at mutually agreeable, less restrictive protections.

## CONCLUSION

In accordance with the foregoing discussion, the motion to compel (Docket Entry # 948) is **DENIED** and the TPO shall remain in

place except with respect to Rivera, Velazquez, and Valdez. The government and counsel for Rivera, Velazquez, and Valdez shall confer and attempt to arrive at mutually agreeable, less restrictive protections.

          /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge