# EXHIBIT 4

# OBJECTIONS TO THE PSI MADE BY THE DEFENDANT

Maria V. D'Addieco  3 March 2022
U.S. Probation Officer
United States District Court
One Courthouse Way
Boston, MA. 02210

     **RE: Angel Calderon PSI Objections**
        **Docket No. 19-CR-10459-23**

Dear Officer D'Addieco:

  I am submitting the objections to the initial presentence investigation report (PSI) prepared by you regarding my client, Angel Calderon. Due to the length of several of the basis of the objections, I am setting out all of the objections first, by paragraph and nature of the objection. Then in the second part, a detailed rationale for each of those objections.

| Report Paragraph (¶) No. | Basis of Objection |
|---|---|
| **The Offense Conduct** | |
| 37 | Role and duration of Angel Calderon as an Inca for MSB |
| 52-55 | No credible evidence supported a firearm being used to assault the victim |
| 57 | Clarification as the government was never able to establish if there was a person named "Anderson" and no information as to any harm to any such person was never located. |
| 59 | Calderon was present but not a participant in the transaction |

| ¶ No. | | Basis of Objection |
|---|---|---|
| 61 | | See Affidavit of Oscar Pena clarifying events of the day in question |
| 63-70 | | response establishing a fictional account as to Angel Calderon, Jorge Rodriguez and Alexis Velasquez showing by all 3 not a single act committed by any of the 3 to engage or participate in such a scheme |

### Offense Level Computation

| 79 | (Specific Characteristics) | Increase should be 3 not 4 |
| 92 | (Adjustment for Role) | Increase should be 2 levels under part c |
| 94 | (Adjusted Offense Level) | Should be 29 |
| 97 | (Total Offense Level) | Should be 26 |

### Criminal History Computation

| 99 | | No points should be counted |
| 100 | | No points should be counted |
| 101 | | No points should be counted |
| 105 | | Score should be 8 |
| 106 | | Does not apply in this matter. |
| 107 | | Total Crim Hist score is IV |

## Sentencing Options

| | |
|---|---|
| 149 | Guideline range would be 92-115 |

## Factors that May Warrant a Variant Senetnce

| | |
|---|---|
| 165 | Pursuant to USC §3553(a) there are factors which warrant a variant sentence showing extraordinary attempts at rehabilitation by the defendant which will be fully set out in his sentencing memorandum |

Maria V. D'Addieco  
U.S. Probation Officer  
United States District Court  
One Courthouse Way  
Boston, MA. 02210

7 March 2022

RE:   **Angel Calderon PSI Objections Part II**
**Docket No. 19-CR-10459-23**

Dear Officer D'Addieco:

Contained here are the detailed rationale for the numbered objections set out in Part I.

¶ 37   This paragraph provides the basis for the 3 level increase set out under ¶ 92 citing USSG § 3B1.1(b). The Probation Officer has set forth a generalized assessment of the role of the defendant as Inca for the Morton Street Bricks chapter ( one of 11 chapters in Massachusetts) of the ALKQN. The extensive discovery provided by the government, appears to show a very limited time frame for that role. He was not in such a position at the time of his arrest. Establishing then when Calderon was named an Inca for MSB, Roldan, as Inca of D5K, cancelled it (see Jenks 0357). The discovery also sets out that this chapter (MSB) was a lesser entity then the D5K in Boston (bates 2382). The discovery does no show any known individual other than Alexis Velasquez as a participating member. The enhancement therefore should be 3 levels in accord with §3B1.1©.

¶ 52-55   These paragraphs form the basis for the recitation and 4 level increase under §2A2.2(b)(2)(B) of 4 levels. The defendant acknowledges that when the multiple count adjustment, under § 3D1.4, is applied, this has no direct impact on the guideline determination. As referenced in the objection to ¶ 59, below, its inclusion will have a detrimental impact on his placement by BOP. The defendant does not contest that he made a knowingly and voluntarily plea to an aggravated assault on a female in Boston on June 15, 2019. That is not the issue the defendant raises by this objection. The objection concerns whether a firearm was a weapon used to commit the aggravated assault. The only evidence of an actual firearm as a weapon to intimidate, is the statements of the victim and her sister. In assessing credibility, for the sole purpose of determining whether an actual firearm was used, the prime issue is how reliable (credible) is the information provided. First, The victim demonstrates a knowledge of firearms by stating the defendant "chambered a round" and then put it to her face. Therefore she understands the immediate danger of a loaded and ready firearm, The victim purports that when told by the defendant, with, according to her, a ready firearm put to her face, she tells him, "yeah and I'll call the cops now". This bravado is further embellished by her sister claiming to yell to the defendant, "pull the trigger if you're a man". No sane person would utter either of these

types of statements under such circumstances. Therefore the reference to an actual a firearm presented as a weapon used to intimidate the victim should be redacted.

¶ 57 The last statement of this paragraph is inaccurate. It should read, "The government was unable to establish who the person, called Anderson" in the transcript ,was, nor if any actual harm came about to such a person."

¶ 59 The defendant submits that any reference to him, as an active participant in a group selling an MP5 to Jorge Rodiguez, should be deleted as unreliable. The discovery appears to show this was a meeting arranged by the government's principle co-operating witness, CW-9. (Bates 250402-03). The defendant is one of a group present. He shows his lack of knowledge of the firearm involved at this meeting when he asks Jorge Rodriguez who is handling the gun, "It ain't loaded right?" The objection by the defendant to such an unproven assertion as a participant in a sale of a firearm would be extraordinarily harmful to his placement by the federal Bureau of Prisons. There is no factual basis in what is presented as to who, of the large group present, brought in the firearm, nor any indication that this defendant would personally profit by its sale. Therefore the defendant moves that this paragraph should be deleted from the PSI

¶ 61    There is an earlier reference in this PSI (¶ 24) of adherence to the strict discipline code of the Latin Kings. In this paragraph, (¶ 61), CW-9 has recorded and reported to the FBI (Bates 3005-3006) what occurred with the defendant present, when Oscar Pena and Stevie Familia-Valdez, are disciplined. They both acknowledged a violation requiring discipline. Neither was subjected to any type of violent, harmful beating. What occurred is set out by CW-9 in these two pages of discovery and in the attached affidavit of Oscar Pena (Exhibit 1 hereto). It was a one minute violation inflicted by one person to their legs and rib area. Neither was reported sustaining any injury.

¶ 63-70    The government sought to validate their principal co-operating witness through an alleged "conspiracy" to murder Angel Roldan by Liberato, CW-9, Jorge Rodriguez, Angel Calderon and Alexis Velasquez. This alleged conspiracy is revealed by CW-9 to the FBI in July of 2019. CW-9 pushes the issue with his co-leaders of the Latin Kings in July and August. There are then recorded conversation with leadership but not any of the alleged co-conspirators except for Liberato.

The three principals in the alleged conspiracy ("AC"), Liberato, Jorge Rodriguez and Angel Roldan have issues with each other.

Two of these, Jorge Rodriguez and Angel Roldan, are the two most dangerous individuals in the entire case. No behind the scenes with either of them, both up front and brutal. Both heavy with firearms and not concerned about using such when needed. Three of the implicated individuals (Rodriguez, Calderon and Roldan) have lingering issues. One difference is Rodriguez and Roldan have issues over money and power. Calderon's issue is shaped differently, more on structure; D5K vs MSB and sanctity of the rules. Velasquez comes as an undefined add on for what reason CW-9 added him to the alleged conspiracy never becomes clear.

The alleged acts which would constitute the formation of the AC are the critical question. In February (16th first) Calderon and Rodriguez give Merlin a complaint about Roldan. A more formal meeting on this issue is held on February 23rd 2019. Trial set for March 26th 2019 with Calderon and Rodriguez prime witnesses. The sole issue there is money taken by Roldan from D5K members for firearms never produced. (See the allegation as set out in the affidavit of Special Agent Dominic Coppo (docket 12-1) §162-171). Liberato supposedly directs Jorge Rodriguez, at some undefined time in June/July 2019 (?), to carry out a "green light" termination order on Angel Roldan. The reason for the order is Roldan's failure to pay back money found owed to other ALKQN members by a

March 2019 trial of Roldan. ( But there would have to have been time given from the end of the trial for Roldan to pay back the money). Liberato admits to the green lighting in an August 31st meeting in Chelsea. He does not make any statement as to whom he spoke, if anyone, about carrying out the order. Merlin states at that time there was never an intent to kill Roldan. (How he would "know" that is also undefined).

No mention is made by Liberato, or anyone else in the August 31st meeting about whom Liberato actual spoke with to carry out his order. It is believed by CW-9 that it was Rodriguez. However, in the filings made on behalf of Jorge Rodriguez, he firmly denied the existence of any such conspiracy involving him. Rodriguez, through his court filing, challenged th government to produce any evidence which would support his involvement. Credence is given to this position by recorded conversations between Liberato and Roldan at the August 31st meeting. They have a face to face discussion. Liberato tells Roland, he, Liberato, went to Roland's house in regard to the "issue" but nothing about with whom, if anyone else, nor when or what he did once there in Lowell. Roland tells Liberato and others "I would've been guns blazing, bro. I got them guns in my crib bro. I got cameras." His statement highlights two facts known to others as far back as February 16, 2019. Guns and cameras at Roland's house. No information is discussed if Liberato

was seen on any of the cameras to establish he actually went there as stated.

If he went to Lowell to shoot Roldan, then why supposedly assign it to Rodriguez? Rodriguez is said by (CW-9) to have reassigned the task to Calderon and Velasquez. CW-9 would have based this assertion by him due to the past history of animosity and dislike between Calderon and Roldan. You have actual words uttered by Calderon on February 23rd, 2019 following the meeting in Springfield. Calderon makes statements (plural) in the ride home about why or how he could/would shoot Roldan. Still hot from the meeting, prodded in the car by CW-9. A strong issue that shows how determined he is to get at Roldan. Then nothing. No substance showing any statements, actions, planning. Same as to any actual contact from Rodriguez, or between Calderon and Velasquez on this issue. NOTHING

There are physical facts which discredit the likelihood Angel Calderon would have been involved. He was on a state court GPS bracelet (Merlin 8-30-2019- "How you gonna send somebody on a bracelet to do a murder"?) since the beginning of the year. Roldan's house sits on a narrow, one way street, in a very congested neighborhood in Lowell. It is all narrow very congested streets.

There were the cameras and weapons Roland spoke about which

Liberato, Rodriguez, Calderon, and potentially Velasquez, knew about since early February 2019. There are no recordings or admissions by Calderon, Velasquez or Rodriguez about discussing, agreeing to or participating in such an event.

Since the structure of the case placed factual assertion upon recorded conversations and there are none for Calderon, Rodrguez or Velasquez indicating any involvement in this alleged conspiracy these paragraphs need to be deleted from the PSI as unsupported.

¶ 79   The level attributed to Angel Calderon here should be 3 not 4 for all the reasons set forth in regard to ¶ 52-55.

¶ 92   the enhancement under §3B1.1 should be 2 under part c. As previously set out the term as a Inca was limited, ( not defined in the discovery) and the size of the chapter as comprising more than Alexis Velasquez is also undefined. None of the 13+ CW's where involved with MSB so there are no recordings from any "meetings". The 5 or more participants for the role of a supervisor or manager would need come from that chapter.

¶ 99   The defendant submits that no criminal history points should be assessed on this case. First is that the charged juvenile offense is one that is even less than disturbing the peace in Massachusetts which carries a potential penalty of 6 months. Here, disturbing a public assembly carries a 30 day potential penalty. Therefore under § 4A1.2(e0(1), it would not count for a criminal history calculation.

Additionally, it is in juvenile court. The defendant will be requesting the court, separately, in his sentencing memo, to consider a categorical policy disagreement with assessing any criminal history points to juvenile court proceedings. Also, in the discussion of the next juvenile case in the PSI, ¶ 100, Angel is presented as a "resident" at a "treatment facility". The juvenile courts were created to give specialized care in protecting juveniles and assure that they received dedicated consideration in assessing the out come of each case. Also, it is outside the 10 year window to be countable

¶ 100 the defendant objects to any point being assigned to his criminal history calculation by this juvenile court proceeding set out in this paragraph. These proceeding are held as confidential analogous to a matter being placed under seal in a federal court proceeding. Juvenile courts are separate entities in each state. There are Interstate Compacts just on juvenile court proceedings. It is difficult to envision that any juvenile justice cautions a child appearing in front of them that if a finding of delinquency is made and a sentence imposed, it could result in an increased sentence in any later federal court proceedings.   This also would be outside the 10 year window to be countable

¶ 101 The defendant objects to inclusion of the point being added to his criminal history score for a matter that was dismissed. The final adjudication in this case on the record it dismissal. Matters

dismissed, annulled, null prossed are all thereafter, a nullity and therefore do not result in a score for criminal history points. Again here, Angel Calderon was a resident in a youth treatment center at the time of this event. In all of these juvenile cases where a potential dismissal is presented through a period of a continuance, it is held out as no harm then no foul. They are being assured it cannot come to harm them unless during the period of the continuance something occurs. Here it is some 10 years later and therefore also outside the allowable time window to be counted.

¶ 106  The defendant objects to the added two points to his criminal history calculation under § 4A1.1(d). This score is asserted to come from Suffolk Superior Court case no. 14-cr-10421. The docket entries for that case clearly show that it was terminated, dismissed on December 10, 2018. There would not then be a basis for this added 2 points to Angel Calderon's criminal history calculation.

¶ 149  Based upon a total offense level of 26 and a criminal history category of IV, the correct guideline range is 92-115.

/s/ Stanley W. Norkunas
Stanley W. Norkunas
Attorney for Angel Calderon

I, Oscar Peña am making this affidavit and swear under the penalty of perjury that the following statement is true and correct to the best of my knowledge.

On March 17 2019 I attended a gathering with friends of mines, I was aware that this gathering would take place a week before the above date. I voluntarily attended this gathering. I also knew and understood what was going to occur at the gathering. While at the gathering some one I am not sure who, recorded the event. And I would like to be clear, what may seem like violence ordered against me is not. I volunteered a week prior to what would and had occured on that date. Angel Calderon was not the reason for what happened on that day. Again I volunteered to what is seen on video or heard on recording. Angel Calderon and I are close and great friends. It's because of Angel I've done lots of positive things. Angel was of help so that I can get my G.E.D, he also was of help in me obtaining a job. Angel has, and continues to give me great advice, one you see given to a younger brother from an older brother. I swear under the penalty of perjury the above statement to be true and correct.

2/2/21

Sworn to and subscribed before me this 3 day of Feb, 2021

[Notary signature and seal: Maureen L. Gorman, Notary Public, State of Rhode Island, Commission Expires 11/01/2025]

[Signed] Oscar Peña